UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Powerbox Systems Americas Corp.
DBA JetCat Turbines Americas.
A Florida Limited Liability Company    )
    )
        Plaintiff,    )
    )
v.    )
    )    CASE NO.: 1:24cv24038
    )
Ingenieurbüro CAT, M.Zipperer GmbH,    )
    )
    Defendant.    )
    )

## COMPLAINT

**COMES NOW,** Plaintiff, Powerbox Systems Americas Corp.  (hereinafter "Plaintiff" or "JETCAT AMERICAS") by and through undersigned counsel,  hereby files this Complaint against Defendant, Ingenieurbüro CAT, M.Zipperer GmbH (referred to as, "Defendant" or "JETCAT GERMANY) and in support thereof, states as follows:

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff, JETCAT AMERICAS, is a corporation located at  2220 CR 210 W. Suite 108-515. Jacksonville, FL.

2. Defendant, JET CAT GERMANY, is a **Gesellschaft mit beschränkter Haftung (GmbH)**, which is a German limited liability company with a principal address at Wettelbrunner Str. 6 Ballrechten-Dottingen, Germany.

## JURISDICTION

1. This Court has subject matter jurisdiction over this claim based upon the diversity of citizenship of Plaintiff and Defendants as provided for in 28. U.S.C. §1332.

2.      The amount in controversy in this claim exceeds $75,000.00, exclusive of interest and

costs.

3.      Additionally, this Court has jurisdiction over the subject matter because the contract was

entered into in Florida, and the Defendant satisfied the minimum contact test by regularly

conducting business and providing goods and services within the State of Florida.

4.      Venue is proper in Miami-Dade County, Florida, pursuant to 28 U.S.C. § 1391(b)(2),

because although the Plaintiff's principal place of business is located in Jacksonville, Florida,

venue is proper in this district as a substantial part of the events or omissions giving rise to the

claim occurred in the State of Florida. Further, under Florida law, venue may be proper in any

judicial district because the Defendant's business activities extend throughout the State of Florida.

5.   All conditions precedent to initiate this action have been either performed, waived, or excused.

## FACTUAL ALLEGATIONS

6.   On or about October 1, 2022, Plaintiff, JetCat Turbines Americas, and Defendant, JetCat

Germany, entered into a Distribution and Sales Agreement (the "Agreement") attached

hereto as **Exhibit A**.

7.   The Agreement granted Plaintiff exclusive distribution rights for Defendant's micro-turbine

engines in North, Central, and South America.

8.   Pursuant to the Agreement, Defendant agreed to provide Plaintiff with sufficient quantities of

micro-turbine engines, along with structured training, marketing support, and technical

assistance, to enable Plaintiff to fulfill its role as the exclusive distributor.

9.   Plaintiff made significant investments in infrastructure, including establishing an e-

commerce platform, hiring staff, and setting up repair facilities, to meet its obligations under

the Agreement.

10. Between November 2022 and March 2023, Plaintiff placed several purchase orders for Defendant's engines.

11. However, Defendant failed to supply the necessary quantities of products, providing only sporadic and insufficient shipments.

12. As a result, Plaintiff was unable to fulfill customer orders and suffered from significant delays, causing immediate financial harm.

13. Despite Plaintiff's investment in marketing, including efforts to develop relationships with major clients in the UAV and defense industries, Plaintiff's ability to meet client demand was severely hampered due to Defendant's failure to provide consistent product supply.

14. Plaintiff repeatedly requested structured training and technical support from Defendant, as required under the Agreement, but Defendant failed to provide such training.

15. Plaintiff was forced to send personnel to Germany at its own expense to obtain unstructured training by shadowing employees.

16. Despite these efforts, the lack of formal support left Plaintiff ill-equipped to handle the complex technical needs of its clients.

17. On or about July 2023, Plaintiff issued a formal letter of breach to Defendant, notifying Defendant of its failure to provide adequate product, training, and support, as well as its violations of the exclusivity clause of the Agreement.

18. Despite the letter, Defendant did not rectify the breaches within the 30-day cure period stipulated in the Agreement. *See* Exhibit A

19. Throughout 2023, Defendant prioritized other customers outside of Plaintiff's exclusive territory, significantly disrupting Plaintiff's ability to maintain relationships with key clients.

20. Defendant's preferential treatment of other customers directly violated the equitable distribution clause of the Agreement, which required fair allocation of products in the event of shortages.

21. Defendant's lack of support and failure to provide engines in a timely manner caused Plaintiff to lose major business opportunities, including large defense contracts.

22. Plaintiff had positioned itself to supply engines for defense and UAV projects, but Defendant's actions led to lost profits, reputational harm, and the deterioration of long-standing client relationships.

23. In September 2023, Plaintiff discovered that Defendant had engaged in direct negotiations with major U.S. companies, including Raytheon and Anduril, to supply engines in violation of Plaintiff's exclusive distribution rights.

24. Defendant pursued these negotiations without informing Plaintiff or involving it in the business dealings, despite the Agreement's clear exclusivity provision.

25. On or around September 2023, Defendant informed Plaintiff of its intention to form a joint venture with a U.S.-based company to pursue a large defense contract worth potentially $300-500 million.

26. This move directly undermined Plaintiff's position as the exclusive distributor and violated the Agreement's terms.

27. Plaintiff continued to suffer from a lack of technical support throughout 2023 and into 2024.

28. Defendant's failure to respond to technical inquiries in a timely manner or to provide accurate data for its engines left Plaintiff vulnerable to customer complaints and exposed it to significant liability.

29. **In July 2024**, Plaintiff sent another **formal letter of breach**, offering to resolve the dispute through arbitration under the rules of the International Chamber of Commerce (ICC).

30. Defendant declined the offer for arbitration, leaving Plaintiff with no choice but to pursue legal remedies.

31. To date, Defendant has failed to fulfill its obligations under the Agreement, including providing sufficient product supply, training, and technical support.

32. Furthermore, Defendant's direct negotiations with major U.S. companies constitute a **breach of the exclusivity clause**, causing Plaintiff to lose business opportunities and suffer significant financial harm.

33. As a result of Defendant's **continued breaches**, Plaintiff has suffered substantial financial losses, including lost profits from missed sales, the erosion of client relationships, and reputational damage within the industry.

34. Plaintiff has been unable to capitalize on the significant demand for Defendant's products due to Defendant's consistent failure to provide adequate support and supply.

35. Plaintiff has also incurred significant expenses due to Defendant's actions, including costs related to marketing, travel for unstructured training, and the maintenance of service facilities that cannot operate at full capacity due to the lack of product availability.

36. Plaintiff made these investments in good faith, relying on Defendant to fulfill its contractual obligations, which Defendant failed to do.

37. Defendant's actions constitute several **material breaches of the Agreement**, including violations of the product supply, training, support, and exclusivity provisions.

38. These breaches have caused the Plaintiff to incur millions of dollars in lost revenue, and despite being notified of these breaches, the Defendant has failed to take corrective action.

39. Plaintiff is now seeking legal remedies, including compensation for its financial losses and damages arising from Defendant's failure to honor the Agreement.

40. Plaintiff hired undersigned counsel and is incurring reasonable attorneys' fees and costs to pursue its rights and its legal remedies.

**COUNT I:**
**BREACH OF CONTRACT (UCC ARTICLE 2)**

41. Plaintiff realleges and incorporates by reference paragraphs 1 through 40 above and states the following:

42. **Plaintiff**, JetCat Turbines Americas, and **Defendant**, JetCat Germany, entered into a Distribution and Sales Agreement on or about **October 1, 2022**.

43.  Under the terms of this Agreement, Plaintiff was granted the exclusive right to distribute Defendant's micro-turbine products in North, Central, and South America.

44. In consideration of this exclusive right, Defendant agreed to provide sufficient quantities of products, training, technical support, and other related assistance necessary for Plaintiff to fulfill its obligations under the Agreement.

45. Plaintiff fully performed its obligations under the Agreement, including but not limited to establishing the infrastructure necessary to distribute, market, and service Defendant's products in the designated territories.

46. Defendant **materially breached** the Agreement by:

a.  Failing to supply sufficient quantities of micro-turbines, causing Plaintiff to lose business opportunities and suffer financial losses;

b.  Failing to provide the training and technical support necessary for Plaintiff to service and distribute the products, which further damaged Plaintiff's business and reputation;

c.  Engaging in direct negotiations with U.S. companies in Plaintiff's exclusive territory, thereby breaching the exclusivity provision of the Agreement.

47. As a direct result of Defendant's breaches, Plaintiff has suffered significant damages, including but not limited to lost profits, damage to its reputation, loss of business opportunities, and costs incurred in reliance on Defendant's performance of its obligations.

WHEREFORE, PLAINTIFF respectfully requests this honorable Court to enter judgment in Plaintiff's favor and award damages, including attorneys' fees and costs, and such other relief this Court deems just and appropriate.

## COUNT II:
## Breach of the Implied Covenant of Good Faith and Fair Dealing

48. Plaintiff realleges and incorporates by reference paragraphs 1 through 40 above and states as follow:

49. This is a claim that is separate from Count 1 or alleged in the alternative.

50. In every contract, including the Distribution and Sales Agreement between Plaintiff and Defendant, there is an implied covenant of good faith and fair dealing, which requires the parties to act in a manner that upholds the purpose of the contract and does not unfairly deprive the other party of the benefits of the agreement.

51. Defendant, by failing to supply sufficient products, failing to provide training and technical support, and engaging in direct negotiations with other U.S. companies in Plaintiff's exclusive territory, acted in bad faith and deprived Plaintiff of the benefits of the contract.

52. These actions by Defendant frustrated the reasonable expectations of Plaintiff under the Agreement and undermined the purpose of the contract, which was to enable Plaintiff to successfully distribute and service Defendant's products in the designated territories.

53. As a direct result of Defendant's breach of the implied covenant of good faith and fair

dealing, Plaintiff has suffered damages, including lost profits, lost business opportunities, and

reputational harm.

**WHEREFORE**, PLAINTIFF respectfully requests this honorable Court to enter judgment

in its favor and award damages, including attorneys' fees and costs,  and such other relief this

Court deems just and appropriate.

### COUNT III:
### Violation of Florida's Unfair and Deceptive Trade Practices Act (FDUTPA) – Florida Statute § 501.204

54. Plaintiff realleges and incorporates by reference Paragraphs 1 through 40 above and states as

follow:

55. Under Florida Statute § 501.204, unfair methods of competition, unconscionable acts, or

deceptive practices in the conduct of any trade or commerce are prohibited.

56. Defendant engaged in **unfair and deceptive trade practices** by:

a.  Secretly negotiating with U.S. companies and engaging in business dealings in Plaintiff's

exclusive territory, despite the exclusivity provision in the Agreement;

b.  Misleading Plaintiff about product availability, causing Plaintiff to expend significant

resources in anticipation of product deliveries that were either delayed or never fulfilled;

c.  Acting in a manner that undermined Plaintiff's business and its ability to compete, including

withholding necessary products and support while engaging in direct competition with

Plaintiff's customers.

57. These actions were unfair and deceptive and have caused significant financial harm to

Plaintiff, including lost profits, damage to business relationships, and reputational harm.

58. As a result of these unfair and deceptive trade practices, Plaintiff is entitled to damages, attorney's fees, and other relief under **Florida's Deceptive and Unfair Trade Practices Act** (FDUTPA).

    **WHEREFORE**, PLAINTIFF respectfully requests this honorable Court to enter judgment in its favor and award damages, including attorneys' fees and costs,  and such other relief this Court deems just and appropriate.

### COUNT IV:
### Breach of Florida Statute § 672.306 (Exclusive Dealings and Best Efforts)

59. Plaintiff realleges and incorporates by reference Paragraphs 1 through 40 above and states as follow:

60. Under Florida Statute § 672.306, where a contract provides for exclusive dealings between a buyer and seller, the seller is required to use best efforts to supply the buyer with goods and enable them to distribute the products.

61. The Distribution and Sales Agreement between Plaintiff and Defendant constituted an exclusive dealing arrangement, under which Defendant was obligated to make its best efforts to supply Plaintiff with the necessary products to distribute in the designated territories.

62. Defendant breached its duty under § 672.306 by:

a. Failing to supply sufficient quantities of products, thus undermining Plaintiff's ability to distribute the goods and fulfill customer orders;

b. Failing to support Plaintiff's efforts to distribute the products through a consistent and reliable supply of goods;

c. Prioritizing other customers over Plaintiff, in violation of its duty to make best efforts in supporting Plaintiff's exclusive distribution rights.

63. As a direct result of Defendant's breach of its obligations under § 672.306, Plaintiff has suffered damages, including lost profits, lost business opportunities, and reputational harm.

**WHEREFORE**, PLAINTIFF respectfully requests this honorable Court to enter judgment in its favor and award damages, including attorneys' fees and costs, and such other relief this Court deems just and appropriate.

JURY TRIAL DEMAND

Plaintiff demands trial by jury.

**Respectfully submitted,**

/s/ ***Davy Karkason***_____
Davy Karkason, Esq.
Florida Bar No. 1031868
Yann Salomon, Esq.
Florida Bar No. 1035624
Transnational Matters, PLLC
*Counsel for Plaintiff*
2121 Biscayne Blvd, #1878
Miami FL 33137
Office: (305) 417-9866
E-mails:dk@transnationalmatters.com
        ys@transnationalmatters.com
        paralegal@transnationalmatters.com

# EXHIBIT A

## DISTRIBUTION AND SALES
## AGREEMENT

This Distribution Agreement (the "Agreement") is entered into on October 1, 2022 (the "Effective Date"), between Powerbox Systems Americas Corp. DBA JetCat Turbines Americas (Distributor), with offices located at 6970 Business Park Blvd, N. Suite 8, Jacksonville, Florida and Ingenieurbüro CAT, M.Zipperer GmbH ("Manufacturer") with offices located at Wettelbrunner Str. 6 Ballrechten-Dottingen. Distributor and Manufacturer are sometimes individually referred to herein as a "Party" and collectively as the "Parties".

ARTICLE I. **APPOINTMENT OF DISTRIBUTOR.**

1.1. **Appointment.** Manufacturer hereby appoints Distributor and its subsidiaries, authorized sub distributors and/or subcontractors, as an authorized distributor of the Manufacturer's products listed in Exhibit A. (the "Products") within the America's including North America, South America. and Central America (the "Territory"). During the term of this Agreement, Manufacturer shall not change the Territory without Distributor's consent. Any new products developed and/or introduced for sale by the Manufacturer during the term of the Agreement will be included in the Products and made available to the Distributor under this Agreement.

1.2 **Manufacturer Obligations.** During the term of this Agreement, Manufacturer shall:  (1) provide distributor with sufficient quantities of Product guides, manuals, brochures, data sheets, sales and product literature; (2) provide training to Distributor's personnel with regard to the use, installation, and maintenance of the Products; (3) promptly provide Distributor with all sales leads in the Territory; and (4) provide reasonable assistance to Distributor, as may be necessary, regarding sales and any issues with the Products that may arise.

1.3 **Exclusive Distributor.** The right granted to Distributor under this Agreement is exclusive within the Territory. Manufacturer shall not have other distributors or sales agents within the Territory. This agreement shall also include commercial contracts in which the potential customer has made initial contact with the distributor. Any specific contracts already in progress with the manufacturer will not fall within this exclusivity. This does not include new contracts that may arise from an already existing manufacturers customer which may have multiple sectors or divisions who seek to fulfill a separate contract. Program name and/or specific application may be used to determine which contracts currently exist with the manufacturer. Future expansion of manufacturing JetCat turbines within the Americas shall be detailed and agreed upon as a separate manufacturing agreement.

ARTICLE II. **PURCHASE ORDERS; PAYMENT TERMS; PRICING.**

2.1. **Purchase Orders.** Distributor shall submit purchase orders to the Manufacturer for the Products. Purchase Orders shall be deemed to have been accepted by and binding upon the Manufacturer unless it advises Distributor in writing of a rejection of a Purchase Order, in whole or in part, within five (5) days of its delivery. If manufacturer is unable to fill all a purchase order for any reason, it shall promptly notify Distributor and Distributor shall have the right, in its discretion, to cancel all or part of the subject Purchase Order. Should any order for products exceed the Manufacturer's available inventory, manufacturer shall allocate its available inventory equitably (or) on a pro rata basis and shall promptly notify Distributor whenever it knows or reasonably believes that it lacks sufficient products to fill Distributor's Purchase Orders.

2.2. **Invoices and Payment Terms.** Manufacturer shall send Distributor invoices for each shipment of Products. Undisputed invoices are due and payable within 60 days or as agreed between both parties. Unless Distributor is in default of its payment obligations hereunder, Manufacturer shall not change the payment terms. If distributor disputes the amounts purportedly owed in an invoice, it shall pay the undisputed portion of the invoice, and notify Manufacturer in writing as to any

DocuSign Envelope ID: 74180C09-3278-4087-83C4-746084F6B1B1

discrepancies with respect to the invoice. The parties may agree in writing through course of dealing to alternative payment terms.

2.3. **Prices.** The initial prices for the Products are set forth on Exhibit B. attached hereto. Manufacturer may change the prices for the Products upon sixty (60) days written notice to Distributor. In the event of a price increase, Distributor shall have the right, at its option, to cancel, in whole or in part, any outstanding Purchase Orders impacted by such price increase. If during the term of this Agreement the Manufacturer sells the Products under similar quantity and delivery conditions to another customer at prices below those stated herein, Manufacturer will immediately extend such lower prices to Distributor.

## ARTICLE III. SHIPMENT TERMS, TITLE AND RISK OF LOSS, ACCEPTANCE.

3.1. **Shipment Terms, Title and Risk of Loss.** All Products purchased by Distributor hereunder will be suitably packaged for shipment in Manufacturer's standard containers, marked for shipment to Distributor at the address specified in the Purchase Order, and delivered to the Distributor or the forwarding agent selected by Distributor within the Territory. Shipment of Products under this Agreement shall be F.O.B. destination. Title and risk of loss will pass F.O.B. destination. Distributor will be invoiced for shipping charges. Manufacturer shall use its best efforts to ship Products to Distributor or before the requested receipt date designated in a Purchase Order and shall immediately notify Distributor when it knows or has reason to believe that a shipment  will not be delivered by the requested receipt date.

3.2. **Inspection and Acceptance.** Distributor shall have thirty (15) days from the date of arrival of the shipment of the Products at the designated shipping location to inspect the Products and notify Manufacturer of any discrepancies, including but not limited to any discrepancies in the quantity or quality of the Products.

## ARTICLE IV. INTELLECTUAL PROPERTY.

4.1. **Intellectual Property Rights.** During the term of this Agreement, Manufacturer grants to Distributor a non-transferable, non-exclusive, limited license to use Manufacturer's logos, trademarks, and trade names (collectively the "Manufacturer Marks"), in connection with the Distributor's marketing, advertisement and sale of the Products in the Territory. Subject to the rights granted in Section 8.3., such license shall terminate upon the expiration or termination of this Agreement. Distributor shall comply with all standards of use for the Manufacturer Marks as instructed in writing by Manufacturer.

## ARTICLE V. MANUFACTURER'S WARRANTY.

5.1. **Warranty.** Manufacturer represents and warrants that the Products will (1) be owned by Manufacturer free and clear of any liens, claims or encumbrances; (2) be fit and sufficient for the purposes for which the Products were manufactured and sold to Distributor; (3) be free from defects in design, material, and workmanship; and (4) be new and merchantable. Manufacturer further represents and warrants that the Products, and Distributor's use and/or sale of the Products, will not infringe any patent, copyright, or trademark of any third party.  Manufacturer shall  be responsible for all liabilities, costs and expenses arising out of any failure to meet the representations and warranties contained in this section.

## ARTICLE VI. INDEMNIFICATION.

6.1. **Manufacturer Indemnification.** Manufacturer agrees to defend, indemnify and hold harmless Distributor and its officers, directors, employees, subsidiaries, parent, agents, and assigns from and against any and all third party losses, damages, suits, expenses (including reasonable attorneys' fees) and costs (each a "Claim" and collectively "Claims") (1) alleging that the Manufacturer Marks or any Products sold to Distributor infringe any patent, trademark

or copyright; (2) arising out of any defects in any Products sold by Manufacturer to Distributor, or (3) arising out of any breach by Manufacturer of any of the terms, conditions, representations or warranties provided in this Agreement. Distributor shall provide Manufacturer with written notice of any Claim and give control of the defense and settlement of the Claim to the Manufacturer.

6.2. **Manufacturer's Obligations for Infringement Claims.** If the use or sale of any Products furnished under this Agreement is enjoined as a result of a Claim, Manufacturer shall, at its own expense, either obtain on behalf of the Distributor the right to continue to use or sell such products, substitute an equivalent product reasonably acceptable to Distributor in its place.

ARTICLE VII. **INTENTIONALLY LEFT BLANK.**

ARTICLE VIII. **TERM AND TERMINATION.**

8.1 **Term.** This Agreement shall commence on the Effective Date and shall continue in full force and effect for five (5) years (the "Initial Term"). Distributor shall have an option to extend the Term for an additional five (5) years.

8.2 **Termination for Breach.** Either Party may terminate this Agreement at any time in the event of a material breach by the other Party that remains uncured after thirty (30) days following written notice thereof. Termination shall be in addition to any other remedies that may be available to the non-breaching Party. Such termination is only permissible if the material breach by one party makes it unreasonable for the other party to continue the contract according to objective standards.

8.3 **Obligations upon Termination.** Upon termination of this Agreement, Distributor shall cease to be an authorized distributor of the Products and (1) all Purchase Orders not yet shipped by Manufacturer may be cancelled by Distributor at its option without liability, and (2) Distributor may, at its sole option, elect to resell to Manufacturer, free and clear of all liens and encumbrances, such Products remaining in Distributor's possession or inventory at the time of termination. Distributor may continue to use any sign, display, or other advertising or marketing materials containing the Manufacturer Marks as reasonably required for the resale of the Products remaining in Distributor's possession or inventory after termination, and Distributor may continue to utilize such materials until all remaining Products have been sold or one hundred fifty (150) days after termination, whichever comes first, after which Distributor shall cease the use of the Manufacturer Marks.

ARTICLE IIX. **GOVERNING LAW AND VENUE.**

9.1. **Governing Law and Venue.** This Agreement shall be governed by the laws of the United States, without giving effect to the principles of conflicts of law of such state and shall be binding upon the Parties hereto in United States and worldwide. Any claims or legal actions by one Party against the other arising under this Agreement or concerning any rights under this Agreement shall be commenced and maintained with the court competent at the seat of Manufacturer. Both Parties hereby submit to the jurisdiction and venue of such court.

ARTICLE X. **GENERAL PROVISIONS.**

10.1. **Severability.** If any provision or portion of this Agreement shall be held by a court of competent jurisdiction or by controlling law to be illegal, invalid, or unenforceable, the remaining provisions or portions shall remain in full force and effect.

10.2. **Entire Agreement, Modification, Waiver.** This Agreement is the entire agreement between the parties with respect to the subject matter and may only be modified by a written amendment signed by both Parties. No waiver of any term or right in this Agreement shall be effective unless in writing, signed by an authorized representative of the waiving Party. The failure

DocuSign Envelope ID: 74180C09-3278-4087-83C4-746084F6B1B1

of either party to enforce any provision of this Agreement shall not be construed as a waiver or modification of such provision, or impairment of its right to enforce such provision thereafter.

ARTICLE XI. **Miscellaneous.**

11.2  If Manufacturer decides to sell its company or discontinue production, Manufacturer will make any such sale contingent on the potential buyer or Manufacturer's business maintaining Manufacturer's obligations under this Agreement.

11.3  Manufacturer agrees to continue providing software and mechanical updates to Distributor of all product lines excluding obsolete/discontinued products and to provide this support to Distributors to maintain the quality and performance of the JetCat Turbines brand and its image.

11.4  Manufacturer agrees to assist the Americas facility with Advertising and Marketing product which include engines as agreed by both parties.

11.5  Service and repairs will be conducted by the distributor for the Americas within its capabilities. Training and continued support will be provided by the manufacturer. Facility equipment and purchases are to be agreed to by both parties.

11.6  Parts required for warranty repairs are to be supplied by the manufacturer at the manufacturers expense. Labor for installation of said parts shall be provided by the distributor as long as the repair/service is within the warranty period which is set by the distributor within the Americas. Any "out of warranty" repairs or service conducted will be billed by the distributor to the customer. Cost of shipping of engines that are within the warranty period will be covered or reimbursed by manufacturer.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the date set forth as the Effective Date above.

**DISTRIBUTOR: Powerbox Systems Americas Corp, DBA JetCat Turbines Americas**

By: _Daniel Diaz_          11/2/2022
      C0E403F0136047A...

Name: Daniel Diaz

Title: Owner/CEO

**MANUFACTURER: Ingenieurbüro CAT, M.Zipperer GmbH/JetCat**

By: _[signature]_          11/2/2022
      6EB750775CDA411...

Name: Markus Zipperer

Title: Managing Director

**EXHIBIT A.**

All products currently being offered by manufacturer and all products released in the future shall be made available for purchase by dealer under this Agreement.

DocuSign Envelope ID: 74180C09-3278-4087-83C4-746084F6B1B1

**EXHIBIT B.**

Products are agreed to be purchased at a discount that depends on the advertised price of the product on the JetCat.de website.

- Product exceeding 2500,00 Euros receive a 40% discount



- Products not exceeding 2500,00 Euros receive a 35% discount

- Engines assembled in the Americas facility will have a future agreed price schedule